

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-1996

# Glaziers and Glass v. Newbridge Securities

Precedential or Non-Precedential:

Docket 95-1175,95-1215,95-1283

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Glaziers and Glass v. Newbridge Securities" (1996). *1996 Decisions*. Paper 92.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/92

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

No. 95-1175, 95-1215, 95-1283


GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252 ANNUITY FUND;
GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252 VACATION FUND;
GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252 PENSION FUND;
GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252 HEALTH FUND;
GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252 HEALTH AND
WELFARE FUND; GLAZIERS AND GLASSWORKERS UNION LOCAL NO. 252
APPRENTICE FUND; SEAN McGARVEY, in his fiduciary capacity; and
MARTIN ROSENBERG, in his fiduciary capacity,

                                        Appellants
                        v.

NEWBRIDGE SECURITIES, INC.; JANNEY MONTGOMERY SCOTT, INC.;
RICHARD L. SOCKET; JAMES A. WILLIAMS; JAMES C. ARSENAULT;
JOSEPH T. FALOTICO; EDWARD J. BERKOWITZ; LARRY R. GOLBESKI;
JOSEPH E. DAVIS; BERNARD GELENBERG; JOSEPH T. ASHDALE;
BARRY SHORE; ANTHONY D'ANGELO; JUNGERS, O'CONNEL & BACHELER,
P.C.; JOHN P. JUNGERS, EQUIBANK, INC. (as successor in interest
to LIBERTY SAVINGS BANK); JOHN DOES I-X; AND PROVIDENT NATIONAL
                        BANK


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


(Civil No. 90-CV-8101)

Argued OCTOBER 26, 1995
Before: STAPLETON, McKEE, Circuit Judges,
and GIBSON, Senior Circuit Judge

(Opinion filed: August 28, 1996)


IRA B. SILVERSTEIN, ESQ. (Argued)
LISA B. CARNEY, ESQ.
Fox, Rothschild, O'Brien & Frankel
2000 Market Street, Tenth Floor
Philadelphia, PA 19103

Leslie M. Gerstein, Esq.

One Penn Center at Suburban Station
1617 J.F.K. Boulevard Ste 1100
Philadelphia, PA 19103-1811

Attorneys for Appellants

ELIZABETH H. FAY, ESQ. (Argued)
KAREN P. POHLMANN, ESQ.
Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA 19103

Attorneys for Appellees


OPINION OF THE COURT



McKEE, Circuit Judge

We are called upon to determine the scope of the fiduciary duty owed by a broker-dealer of securities under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1104(a) in the rather narrow circumstances presented by this appeal. Various employee benefit funds sued Janney Montgomery Scott, Inc. ("Janney") alleging that Janney's failure to disclose information about one of Janney's employees was a breach of Janney's fiduciary duty under Section 404(a) of ERISA, and under federal and state common law. The district court assumed for purposes of summary judgment that Janney was a "functional" or "limited purpose" fiduciary pursuant to Section 3(21)(A)(ii) of ERISA, 29 U.S.C. § 1002(21)(A)(ii), but held that any liability that Janney had in such capacity extended only to its investment advice. Since Janney's alleged breach had nothing to do with investment advice, the district court granted summary judgment in favor of Janney and against the Funds on each count of the complaint. See Glaziers and Glassworkers Union Local 252 Annuity Fund, et al. v. Newbridge Securities, Inc., et al., 877 F.Supp. 948, 953-954 (E.D.Pa. 1995).

For the reasons that follow we will affirm the grant of summary judgment on the federal common law claim, but reverse the grant of summary judgment on the ERISA claim, and the state common law claim.

I. Factual Background

The plaintiffs are numerous funds maintained by Local 252 of the Glaziers and Glassworkers Union (the Annuity Fund, Pension Fund, Health and Welfare Fund, Vacation Fund, and Apprentice Fund), and two individual fiduciaries of those funds – Sean McGarvey and Martin Rosenberg (collectively, the "Funds"). Each of the funds are related Employee Benefit Plans managed by a

board of trustees.  Historically, the Funds limited the majority of their investments to federally-insured certificates of deposit issued by Philadelphia area banks that the Funds' trustees were familiar with.

The seeds of the instant suit were sown in 1982 when Richard Socket, the Funds' Administrator, met a Janney employee named Michael Lloyd.  Socket introduced Lloyd to the Funds' trustees and recommended that the trustees consider and accept Lloyd's advice on new investments.  Socket was particularly interested in CDs issued by non-Philadelphia area banks with which Lloyd was familiar and which offered rates of interest superior to those offered by Philadelphia area banks.

At some point between 1982 and June 1985, Lloyd became a Vice President at Janney.  He also became increasingly involved with the Funds and their investments.  During that period, the Funds, on Lloyd's advice, purchased a total of 73 CDs and other investments through Janney.  The total value of these investments was in excess of $3,000,000.

The Funds contend that as time went on Lloyd routinely attended meetings of the Funds' trustees, offered advice concerning overall investment strategy, and came to be referred to as the Funds' "investment consultant."  The Funds also allege that Lloyd would routinely call Socket and recommend a particular investment as being particularly well-suited to the Funds' specific investment strategy.  According to Socket, it was rare that the Funds did not accept that advice.

At a meeting held on June 12, 1984 the trustees passed a motion appointing Lloyd "the financial consultant to all funds." See Brief of Appellee at 6.  His relationship with the Funds can be gleaned in part from the minutes of the trustees' meeting of August 28, 1984, which read: "an investment decision may be made by the [Funds'] administrator with the approval of one trustee from each side [Employer and Union], to carry out recommendations of investment consultant, Michael Lloyd."  This relationship continued for sometime to the apparent satisfaction of all concerned.

However, the plot began to thicken in early June of 1985 when Janney began investigating Lloyd because of suspected improprieties in Lloyd's personal investments.  Lloyd had failed to make a payment to a partnership in which he was a limited partner, and Janney had come to suspect that he had tried to cover-up the late payment by tendering a cashier's check that had been fraudulently altered to create the appearance that it had been timely presented.  Lloyd failed to explain what had actually occurred, but he did deny any wrongdoing.  Despite Lloyd's denial, Janney conducted an internal investigation.  Pending the completion of the investigation, and prior to a scheduled meeting with Lloyd's attorney, Janney informed Lloyd that he was suspended.  Thereafter, on June 17, 1985, Janney informed Lloyd's attorney of its intent to discharge Lloyd.  The following morning, June 18, 1985, Lloyd resigned from Janney.

Each of the parties to this dispute put their own "spin" on the circumstances leading to Lloyd's resignation.  The Funds argue that Lloyd continued to obfuscate and prevaricate

throughout Janney's investigation thereby causing Janney to discharge him. Janney, however, argues that Lloyd was forced to resign because he was unable to conform to the very high standard of conduct demanded of Janney employees.

In any event, when Lloyd left, Janney reported his departure to the National Association of Securities Dealers ("NASD") as required by the rules of that association. Janney completed the required "Uniform Termination Notice for Securities Industry Registration" form, and sent it to the NASD. Question No. 14 on that form asks:

> Is there reason to believe that the individual while employed or associated with your firm, may have violated any provision of any securities law or regulation or any agreement with or rule of any governmental agency or self-regulatory body, or engaged in any conduct which may be inconsistent with just and equitable principles of trade?

(Joint Appendix at 151a). Janney answered "Yes," and included a detailed narrative explaining that answer. In relevant part, Janney's explanation included the following:

> In November 1983, Mr. Lloyd purchased one unit of Austin Investors, L.P., a real estate limited partnership, at a cost of $39,500. The terms of the partnership agreement called for annual contributions to be remitted directly to Ascott Investment Corp. During the month of February 1985 our Financial Services Department became aware that the payment due February 1, 1985 had not been received by the Partnership. It is standard procedure to be notified by them in the event of apparent late payment by any of Janney's customers. Enclosed are a series of letters from Ascott to Mr. Lloyd with respect to the past due payments.

> Upon learning of this, personnel of that department asked Mr. Lloyd for an explanation. He reported to them that timely payment had in fact been remitted by him. In an effort to resolve any question, Mr. Lloyd was asked to furnish some evidence of that payment. In late May, he presented to Firm personnel a copy of the face of a Cashier's Check in the amount of $9,980. . . .This showed a date of "2-21-85" and the payee as Ascott Investment Corp. In consideration of this, our Firm contacted Ascott, advised them of the check copy, and asked that they review their records. It was subsequently reported by them that they were unable to find any record of this check. Mr. Lloyd was asked to

obtain a copy of the reverse side of that
check which should have shown an endorsement
and thus establish whether Ascott had in fact
cashed the check.  It was also suggested that
he issue a stop payment on the February
check. On June 6, 1985 Mr. Lloyd did purchase
a Cashier's Check for $9,980 which was
delivered to Austin to cover the payment due
for February.

Our firm then made inquiries at Fidelity
Bank, where the check had been drawn. . .
After a search of their records, they
notified us that they could find no evidence
of a check dated February 21, 1985.  However,
based on their further review they identified
that February check as one which was actually
drawn May 21, 1985.

In light of these disclosures it appeared
that the May 21, 1985 check and the February
21, 1985 check were one and the same.
Moreover, there was an inference that the May
21 date may have been altered to represent a
"2-21-85" date on the copy presented as proof
of payment.

(Joint Appendix at 152a-153a).

Janney did not inform the Funds of the circumstances
surrounding Lloyd's departure.  Instead, Janney assigned a new
account executive, Mitchell B. Pinheiro, to Lloyd's accounts,
including the Funds' accounts.  On June 20, 1985, Pinheiro wrote
a letter of introduction to Socket in which Pinheiro informed the
Funds only that Lloyd had resigned as a Janney representative.
The NASD conducted its own investigation of Lloyd.  That
investigation resulted only in the NASD issuing a letter of
caution to Lloyd in which it reminded him that he was obliged to
ensure that his own personal securities transactions were paid in
a timely fashion.
Meanwhile, Lloyd had established Lloyd Securities, Inc.
("LSI"), upon leaving Janney.  Six days after Lloyd left Janney,
the Funds decided to follow him and to transfer their accounts to
Lloyd's new firm.  Once Lloyd obtained the necessary regulatory
approvals he asked the Funds to transfer their accounts from
Janney to LSI.  On June 24, 1985, the Funds' trustees voted to
transfer the Funds' accounts from Janney to Lloyd and his new
firm.  However, the transfer was not made until sometime in
September of 1985 when Janney transferred the Funds' accounts to
Provident National Bank (as custodian) pending final transfer to
Lloyd and LSI, in accordance with instructions from Socket.
Janney does not suggest that it did not know that the accounts
were to be transferred to LSI and Lloyd when it transferred the
accounts to Provident pursuant to Socket's instructions.  Janney

never told the Funds of the circumstances surrounding Lloyd's departure from Janney.

After the Funds transferred their accounts to LSI, the Funds expanded the type and scope of investments which they permitted Lloyd to make on their behalf. The relationship with Lloyd continued until March, 1990, when the Funds learned that Lloyd and LSI were under investigation by the SEC and, concerned over the handling of their investments, finally terminated their relationship with Lloyd. However, by that time, Lloyd had stolen Fund assets in excess of $500,000 and had wasted additional assets in excess of $2,000,000 in what the Funds refer to as "bizarre and worthless investments."

Eventually, Lloyd pled guilty to numerous criminal offenses based upon his fraudulent conduct. In his guilty plea, he admitted stealing money from customers, including the Funds, and covering the thefts with forged and bogus documents. He was sentenced to a prison term and the SEC and other regulatory authorities shut down LSI and its related companies.

The Funds contend that Janney did not offer the information about the circumstances of Lloyd's departure out of fear of being sued by Lloyd. Janney denies this and explains that it did not inform the Funds of the circumstances of Lloyd's departure because it had only unproven suspicions that Lloyd never admitted. Janney thus argues that it "acted prudently in not volunteering to customers unproven allegations and innuendo, which might well have been false." Brief of Janney at 8.

## II. Procedural History.

The Funds filed a three count complaint against Janney alleging breach of fiduciary obligations under Section 404(a) of ERISA (Count I), and breach of fiduciary duties under both federal and state common law (Counts II and III respectively). The Funds claimed that Janney was a fiduciary under ERISA and that Janney breached its fiduciary duty by failing to disclose the circumstances surrounding Lloyd's departure. The Funds asserted that had they known about Lloyd's conduct, they would not have transferred their accounts to Lloyd and LSI, and incurred the losses that purportedly resulted. After the pleadings were closed and discovery completed, the Funds and Janney filed cross-motions for summary judgment, and the district court granted summary judgment for Janney. In rejecting the Funds' theory, the district court stated:

> We do not today address the issue of whether Janney is an ERISA fiduciary because of our conclusion that the circumstances complained of fall outside the scope of any fiduciary relationship that may have existed between Janney and the Funds. Thus, any fiduciary obligation did not encompass a duty to inform the Funds of the circumstances regarding Mr. Lloyd.

Glaziers and Glassworkers Union Local 252 Annuity Fund, et al. v. Newbridge Securities, Inc., et al, 877 F.Supp. 948, 951 (E.D.Pa. 1995). The court reasoned that any exposure Janney may have had

because of Lloyd's investment advice to the Funds, was limited to "the substance of the advice provided."  Id. at 953.

The district court granted summary judgment to Janney on Count II (the federal common law claim) because it concluded that the regulatory scheme of ERISA left no room for the application of federal common law.  Id. at 954.  Finally, since any claim the Funds may have had under state common law was pre-empted by ERISA, the district court granted Janney's motion for summary judgment on Count III as well. Id.

### III. Discussion
### A. Standard of Review.

Summary judgment is proper only where there is no genuine issue of material fact for the fact-finder to decide. Fed.R.Civ.P. 56(c).  In order to demonstrate the existence of a genuine issue of material fact, it is the burden of the nonmovant to supply sufficient evidence, not mere allegations, in support of its position for a reasonable jury to find for the nonmovant. Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993).  Our standard of review on an appeal from a grant of summary judgment is plenary. Id. at 146. We apply the same test the district court should have used initially, Public Interest Research Group of New Jersey v. Powell Dufftyn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991), and review the facts in the light most favorable to the party against whom summary judgment was entered.  Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d at 146.

### B. Janney's Failure to Disclose.
As noted above, the district court assumed that the Funds could establish that Janney was a fiduciary but held that since it was undisputed that any loss did not result from Janney's investment advice, the Funds could not recover.  The Court reasoned:

> Since it undisputed that Janney was never a named fiduciary, its liability must be limited to the function it performed; . . . The Funds' claims are based not on the substance of the advice it received from Janney, but on their contention that subsumed under the rubric of 'investment advice' is the right to be informed as to the nature of the individual providing that advice.
>
> \*   \*   \*
>
> . . . we must conclude that events complained of fall outside the scope of the fiduciary duty Janney may have owed to the Funds, and that Janney was under no duty to relate to the Funds the information concerning Mr. Lloyd.

877 F.Supp. at 953.

Accordingly, we begin with a discussion of the scope of any

fiduciary obligation that may have been owed to the Funds. However, because the scope of duty owed is, to some extent, dependent upon the type of fiduciary status one has, we must briefly discuss how Janney may have become a fiduciary. In doing so, however, we do not intend to suggest that Janney was or was not a fiduciary, or that any loss the Funds sustained was caused by anything Janney did or failed to do. The district court made no finding on those issues because no finding was necessary given its reasoning. On remand, the district court will be able to properly develop a record and determine if Janney's relationship to the Funds was that of fiduciary, and to what extent the Funds can establish causation.

There are three ways to acquire fiduciary status under ERISA: (1) being named as the fiduciary in the instrument establishing the employee benefit plan, 29 U.S.C. § 1102(a)(2); (2) being named as a fiduciary pursuant to a procedure specified in the plan instrument, e.g., being appointed an investment manager who has fiduciary duties toward the plan, 29 U.S.C. § 1102(a)(2); 29 U.S.C. § 1002(38); and (3) being a fiduciary under the provisions of 29 U.S.C. § 1002(21)(A), which provides that a person is a fiduciary

> with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The district court correctly referred to regulations of the Department of Labor that clarify "rendering investment advice" under ERISA. The regulation provides:

> A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of [ERISA][i.e., 29 U.S.C. 1002(21)(A)(ii)] and this paragraph, only if:
>
> (I) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and
>
> (ii) Such person either directly or indirectly (e.g., through or together with

any affiliate)-

(A)  Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B)  Renders any advice described in paragraph (c)(1)(I) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1).

Here, both the Funds and Janney agree that Janney could only have become a fiduciary under the provisions of 29 U.S.C. 1002(21)(A)(ii), i.e., that Janney "render[ed] investment advice for . . . compensation" or had "authority or responsibility to do so." The Funds admit that Janney had no discretionary authority with respect to "purchasing or selling securities or other property" for the Funds and, accordingly, alternative "(A)" does not apply.  Therefore, if Janney was an ERISA fiduciary because it rendered investment advise for a fee, it acquired this status under alternative "(B)".

### C. The Scope of Janney's Duty.

The district court relied in part upon a Department of Labor regulation, 29 C.F.R. § 2509.75-8 (FR-16), to hold that Janney's liability as a non-named fiduciary was limited to any investment advice it may have rendered. That regulation provides:

"The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions which he or she performs with respect to the plan."

Janney cites Blum v. Bacon, 457 U.S. 132 (1982) in arguing that this regulation is entitled to substantial deference. See Brief of Janney at 20.  However, that is beside the point.  First, it is not as clear as Janney suggests that the alleged breach has no nexus to any duty it may owe. Lloyd was retained and entrusted with substantial assets belonging to the Funds. Although his integrity and honesty may not bear a direct relation  to the caliber of financial advice he gave, it is unrealistic to suggest

that a broker's integrity is irrelevant to how he or she will dispose of assets of another that have been entrusted to that broker's care, custody and control.  Second, even assuming that Janney's position in this regard has merit, this case does not require us to choose between respect for an agency's expertise on the one hand, and affording de novo review on the other.  29 C.F.R. § 2509.75-8 (FR-16) does not establish a universal principle that allows for no exceptions. It merely states that exposure of an unnamed fiduciary is "generally" limited to the functions it performs. We must determine whether any liability of Janney should be so restricted under these circumstances.  We conclude that, although, exceptions to this general rule may often produce results that would be both unworkable and unfair, this is not such a case.

Section 404(a) of ERISA defines the duty that a fiduciary owes as follows:

> a fiduciary shall discharge his duties with respect to a plan in the interest of the participants and beneficiaries and --
>
> (A) for the exclusive purpose of:
>
> (I) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying the reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims

U.S.C. § 1104(a).  "Section 404(a) [29 U.S.C. § 1104] is the touchstone for understanding the scope and object of an ERISA fiduciary's duties."  Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1299 (3d Cir. 1994). In Bixler, we reiterated the following pronouncement of Justice Brennan  in Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 153-53 (1985): "Congress intended in § 404(a) to incorporate the fiduciary standards of trust law into ERISA, and it is black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits."  Bixler, 12 F.3d at 1299.  Thus, section 404(a) "although articulat[ing] a number of fiduciary duties, is not exhaustive."  Id.   See also, Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570 (1985) ("Congress relied upon the common law of trusts to 'define the general scope of [trustees' and other fiduciaries'] authority and responsibility'").

Under the common law of trusts, a fiduciary has a fundamental duty to furnish information to a beneficiary.  "This

duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." Bixler, at 1300. See also, Globe Woolen Co. v. Utica Gas and Electric Co., 121 N.E. 378, 380 (N.Y. 1918) ("A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word.").

The Funds contend that the evidence shows that Janney knew that Lloyd's representation about his payment to the limited partnership was false, and that Janney strongly suspected that Lloyd had altered a negotiable instrument to cover his tracks. Although Janney now suggests that it had no proof of Lloyd's own wrong doing and surmised that he may have been covering up for a sister, the information Janney gave to the NASD clearly establishes that Lloyd's integrity was, at best, suspect. Yet, Janney sat silently by knowing that the Funds were placing their assets under Lloyd's control. According to the Funds, Janney's reasons for doing so had nothing to do with a careful, prudent, or reasoned consideration of what was best for the Funds. They point to the deposition of Rudolph Sander, a Janney executive, as instructive. When asked if he thought it "would have been important for the accounts to know that Mr. Lloyd was involved in this kind of conduct" he responded:

> If I have a suspicion that somebody did
> something wrong and he feels he didn't, and I
> tell [a] . . . customer that, in our opinion,
> we have a suspicion that this man has done
> something wrong and it impinges on his
> ability to make a living, I think he would
> have had a good, very good case against us.
> So which side of that would you like to be
> on?

Appendix at 269a. This, the Funds argue, shows that Janney withheld the information from the Funds that it gave to the NASD out of a fear of being sued, and a concern for its own well being.

Janney seeks to prevail on two theories. First, Janney would have us hold that if it was a fiduciary, the Funds' failure to make a specific request for information about Lloyd somehow alleviated any obligation Janney would have otherwise had to disclose the very information the Funds needed in order to prudently conduct their affairs. Such a result would not only hoist the beneficiary by its own petard, it is contrary to well established principles governing the relationship between a fiduciary and beneficiary. The Restatement (Second) of Trusts provides:

> [The trustee] is under a duty to communicate
> to the beneficiary material facts affecting
> the interest of the beneficiary which he
> knows the beneficiary does not know and which
> the beneficiary needs to know for his
> protection in dealing with a third person.

Restatement (Second) of Trusts § 173, comment d. (1959).

We have never held that a request is a condition precedent to such a duty regardless of the circumstances known to the fiduciary. To the contrary, it is clear that circumstances known to the fiduciary can give rise to this affirmative obligation even absent a request by the beneficiary. "[T]he duty to disclose material information 'is the core of a fiduciary's responsibility.'" Bixler, 12 F.3d at 1300. Indeed, absent such information, the beneficiary may have no reason to suspect that it should make inquiry into what may appear to be a routine matter. If Janney was a fiduciary, the Funds' failure to request information concerning Lloyd's departure has no bearing on whether Janney breached the duties it owed the Funds by not volunteering the information.

Second, Janney argues that it never had sufficient information to determine what the Funds needed to know because it was not certain Lloyd had violated securities regulations or the law when he left Janney. Since Lloyd's transgression pertained only to his personal business affairs, Janney maintains that it discharged him because he did not "'act in a very high standard'" Janney demands of its employees. Brief of Janney at 8. Janney insists that Lloyd's refusal to fully explain the circumstances of the late payment did not meet that standard. Refined to its essence, Janney argues that there was no reason to tell the Funds about the circumstances surrounding Lloyd's departure or to believe that the Funds needed the information to protect itself in its dealings with Lloyd, because there was only unsupported suspicion of misconduct that did not appear to involve any clients' accounts.

Contrary to Janney's assertion, we believe that there is a genuine issue of material fact concerning the breach of fiduciary duties. Janney gave the NASD a detailed narrative that supports an inference that Lloyd altered a check to make it appear that payment had been duly made. Lloyd was sufficiently compromised that Janney intended to discharge him. There is a dispute, however, concerning Janney's motivations and the materiality of the information not volunteered. From Janney's characterization of Lloyd's departure, a finder of fact could conclude that there was no breach of any duty. If, in contrast, the Funds' characterization of the events prevails, a finder of fact could properly conclude that Janney's conduct falls within the boundaries of the Restatement (Second) of Trusts § 173, comment d set forth above. Moreover, we believe that it might come under such a responsibility should come as no surprise to Janney. Over 80 years ago Judge Cardozo explained:

> The trustee is free to stand aloof, while
> others act, if all is equitable and fair. He
> cannot rid himself of the duty to warn and
> denounce, if there is improvidence or
> oppression, either apparent on the surface,
> or lurking beneath the surface, but visible
> to his practiced eye.

Globe Woolen Co. v. Utica Gas & Electric Co., 121 N.E. at 380. If Janney was a fiduciary, it could not turn its "practiced eye" to its self-interest, while turning a blind eye to the interests of its beneficiary.

We do not, of course, hold that one who may have attained a fiduciary status thereby has an obligation to disclose all details of its personnel decisions that may somehow impact upon the course of dealings with a beneficiary/client. Rather, a fiduciary has a legal duty to disclose to the beneficiary only those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection. The scope of that duty to disclose is governed by ERISA's Section 404(a), and is defined by what a reasonable fiduciary, exercising "care, skill, prudence and diligence," would believe to be in the best interest of the beneficiary to disclose.

Here, Janney provided information to the NASD which certainly called Lloyd's character and integrity into question. However, we do not dismiss the fact that the NASD, after being supplied with that information by Janney and after its own investigation, chose only to issue a relatively minor reprimand to Lloyd. Thus, it is certainly conceivable that the Fund would have transferred assets to Lloyd even if Janney had made a disclosure to the Fund. Nevertheless, we conclude that Janney's failure to disclose creates an issue of fact as to whether it acted with the exercise of "care, skill, prudence and diligence," required by Section 404(a), and if not, whether failure to do so caused Lloyd's subsequent loss.

In summary, we hold that, on remand, if the fact-finder determines that Janney was an ERISA fiduciary, then Janney, as an ERISA fiduciary, had a duty to disclose to the Funds any material information which it knew, and which the Funds did not know, but needed to know for its protection. Whether the information contained in the NASD report is that kind of material information which Janney, in the exercise of "care, skill, prudence and diligence," was required by Section 404(a) to disclose is a factual question to be determined by the fact finder. The well established obligations endemic in the law of trusts requires nothing less.

          C. The Duration of The Relationship. Lloyd's departure from Janney before the Funds transferred
its accounts to LSI will not relieve Janney of all obligations to the Funds if Janney was a fiduciary. Assuming arguendo that Janney became an ERISA fiduciary on August 28, 1984, when the Funds' trustees named Lloyd their investment consultant, we believe ERISA fiduciary duty law, and the law of trusts it incorporates, would require that the duty to disclose material information continue beyond his departure. If found to be a fiduciary, Janney cannot realistically argue that despite its prior fiduciary role, it can disavow all duties to ensure the sound management of the Funds' assets. Nor does the fact that little investment activity occurred between the time of Lloyd's

resignation and the transfer of the Funds' accounts to Provident detract from Janney's fiduciary status. Fiduciary status, once established, is not dependent solely on the amount of investment activity.

While fiduciary relationships generally, and under ERISA in particular, are consensual in the sense that the parties must voluntarily enter a relationship having the stipulated characteristics, once a fiduciary relationship exists, the fiduciary duties arising from it do not necessarily terminate when a decision is made to dissolve that relationship. Courts that have considered the issue have held that an ERISA fiduciary's obligations to a plan are extinguished only when adequate provision has been made for the continued prudent management of plan assets. See Chambers v. Kaleidoscope, Inc., Profit Sharing Plan and Trust, 650 F. Supp. 359, 369 (N.D.Ga. 1986); Pension Benefit Guaranty Corp. v. Greene, 570 F. Supp. 1483, 1488 (W.D.Pa. 1983), aff'd, 727 F.2d 1100 (3d Cir.), cert. denied, 469 U.S. 820 (1984); Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629, 635 (W.D.Wis. 1979). This obligation to ensure that fiduciary obligations will continue to be met is a component of the prudence imposed by Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B) ("a fiduciary shall discharge his duties . . . with the care, skill, prudence and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would employ). Chambers, 650 F. Supp at 369; Greene, 570 F. Supp. at 1497-98; Freund, 485 F. Supp at 635.

In this case, the fiduciary relationship existed, if at all, as the result of an agreement under which Janney undertook for a fee to provide advice on a regular basis to the Funds that would "serve as a primary basis for investment decisions with respect to plan assets" and to "render individualized investment advice to the plan regarding such matters as . . . investment policies or strategy, overall portfolio compositions, or diversity of plan investments." The Funds came to have such a relationship with Janney only because of their faith in Lloyd. When Lloyd left Janney, it became uncertain whether that relationship would continue and, shortly thereafter, the Funds ceased to utilize the services of Janney in the same way. Accordingly, the fiduciary status of Janney under ERISA, which was predicated solely on that relationship, ceased. Under the applicable principle of trust law, however, Janney's fiduciary duty to advise the Funds of information they needed for their own protection continued at least until someone (the Funds themselves or another investment advisor) undertook to exercise the function that Lloyd had performed as a Janney vice president. Thus, at the point when Janney was advised of the Funds' intention of engaging Lloyd's new firm as a fiduciary, Janney retained a fiduciary duty to disclose to the Funds material information then in its possession concerning Lloyd's conduct.

Our holding that a duty to disclose material information may extend beyond Lloyd's departure finds support in the common law of trusts. Under the traditional law of trusts, a trustee cannot relieve himself or herself of duties under the trust simply by conveying the trust assets to another willing to serve. ii Austin

Wakeman Scott & William Franklin Fratcher, the law of trusts § 106 (4th ed. 1987). A trustee's resignation is valid under three circumstances only, i.e., when the trustee resigns with permission of the appropriate court, with the consent of all the beneficiaries or in accordance with the terms of the trust. The Law of Trusts § 106. Further, a resigning trustee is not relieved of liability for his or her management of the trust until he or she has accounted to a court for the trust's administration. The Law of Trusts § 106.1; see also, e.g., Nixon's Estate, 83 A. 687 (Pa. 1912) ("The general rule is that a trustee may relieve himself from liabilities arising from a trust relation by submitting the administration of the trust to the jurisdiction of the court.").

Although these common law rules help to guarantee the continued proper administration of the trust, they are not completely workable in the ERISA context. For example, ERISA does not provide for a court accounting procedure for a resigning fiduciary. Nonetheless, the purpose underlying those principles is relevant to our inquiry. There are times when "the law of trusts. . will inform, but will not necessarily determine the outcome, of an effort to interpret ERISA's fiduciary duties." Varity Corp. v. Howe,    U.S.   , 116 S.Ct. 1065, 1070 (1996). In such a case, the common law of trusts is the "starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common law trust requirements." Id.

ERISA "protects employee pensions and other benefits. . . by setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefits plans." Varity Corp. v. Howe, 116 S.Ct. at 1070. Therefore, when "we apply [ERISA's fiduciary duty section] to the facts of a particular case, we remain mindful of ERISA's underlying purposes." In re UNISYS Savings Plan Litigation, 74 F.3d 420, 434 (3d Cir. 1996). The protection which ERISA is intended to afford private pension and benefit plans would be vitiated if an ERISA fiduciary was able to simply walk away from the plan under the circumstances presented to us here. An ERISA fiduciary is defined "not in terms of formal trusteeship, but in functional terms of control and authority". Mertens v. Hewitt Assoc.,    U.S.   , 113 S.Ct. 2063, 2071 (1993).

According to the Funds, the information Janney provided on the NASD form indicates that Lloyd improperly handled his own investments, fraudulently altered a commercial instrument and lied about his actions. If Janney was a fiduciary, and if its conduct would otherwise be a breach of fiduciary duties, it may not hide behind Lloyd's departure to shield it from the consequences of its actions.

## IV. Common Law Duty

The Funds argue: "to the extent [they] do not have a statutory claim against Janney under ERISA, they do have such a claim either under federal common law or under state common law." See Brief of the Funds at 39. As noted earlier, the district

court granted Janney's motion for summary judgment as to both theories. Accordingly, we turn our attention to the Funds' claims for relief under federal and state common law.

## A. Federal Common Law

Congress has authorized federal courts to create common law in certain instances. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456–57 (1957). However (as the learned district court correctly noted) we do so only to further Congress' intent by filling gaps in specific legislation.

> Since Congress both authorized and expects that the courts will create a common law under ERISA, we need not look for a specific congressional intent to create the remedy at issue. Instead, the inquiry is whether the judicial creation of a right in this instance is 'necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress. . .'

Plucinski v. I.A.M. National Pension Fund, 875 F.2d 1052, 1056 (3d Cir. 1989). We find no such interstices here. Accordingly, we affirm the district court's grant of Janney's motion for summary judgment on Count II.

## B. State Common Law

Section 514(a) of ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96–97 (1983). The district court held that the state common law claim was pre-empted by ERISA and therefore granted Janney's motion for summary judgment on that claim. The district court premised its preemption holding on its belief that the state law claim involved the administration of the Funds' pension and benefits plans. Glaziers and Glassworkers Union Local 252 Annuity Fund, et al. v. Newbridge Securities, et al., 877 F. Supp. at 944–945 ("Indeed, this Court has held that a plaintiff's breach of fiduciary duty claim relating to the administration of an employee benefit plan brought under state law is preempted by ERISA. Accordingly, we must conclude that the Funds' [state law] breach of fiduciary duty claim is preempted by ERISA. . . .").

The Funds contend that the district court's preemption finding is dependent upon an initial finding that Janney was an ERISA fiduciary. If, however, Janney is not ultimately found to be an ERISA fiduciary, the Funds argue that its state law claim does not "relate to" an employee benefit plan and that it is, therefore, not preempted. In that case, the state law claim would simply be a "commonplace", "run-of-the-mill state law claim" which, although "affecting and involving" an ERISA plan is not pre-empted by ERISA. See Mackey v. Lanier Collection Agency & Service, 486 U.S. 825, 833 (1988). In short, the Funds can continue to press its state law claim against Janney.

We believe there is merit to the Funds' preemption argument.

Although there is no bright line between a claim which "affects or involves" an ERISA plan without, at the same time, "relating to" an ERISA plan, our opinion in United Wire, Metal and Machine Health and Welfare Fund, et al. v. Morristown Memorial Hospital, 995 F.2d 1179 (3d Cir. 1993), does aptly describe how a state law relates to an ERISA Plan. We wrote:

> A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefit plans, it if singles out such plans for special treatment, or if the rights and restrictions it creates are predicated on the existence of such a plan.

> **************************

> This does not end our inquiry, however. A state rule of law may be preempted even though it has no such direct nexus with ERISA plans if its effect is to dictate or restrict the choices of ERISA plans with regard to their benefits, structure, reporting and administration, or if allowing states to have such rules would impair the ability of a plan to function simultaneously in a number of states.

995 F.2d at 1192-1193.

If, on remand, the district court finds that Janney was not an ERISA fiduciary, the Funds' state law claim should be subjected to the analysis in United Wire. It may very well be that even in the event that Janney is not an ERISA fiduciary, the state law claim may relate to an ERISA plan and be preempted. However, if Janney is not found to be an ERISA fiduciary, there is still room to argue that any fiduciary duty Janney may have had toward the Funds arises under state law and does not "relate to", but only "affects and involves" an ERISA plan. That is, the state law claim may not relate to the administration of an employee benefit plan at all. For example, the Funds may successfully argue that there is a fiduciary duty which arises between a client and a stockbroker and that the duty was breached by Janney's failure to disclose.

Thus, we cannot, at this juncture, either prevent the Funds from trying to show that its state law claim is not preempted or hold as a matter of law that the state law claim is preempted. Of course, it may be impossible for the Funds to demonstrate that their claim is not preempted (even if Janney is not an ERISA fiduciary); however, that finding should be made by the district court after it makes a finding on Janney's status as a fiduciary under ERISA.

Finally, if the district court finds that state law claim is not pre-empted, it will then have to determine if the claim is time-barred as Janney contends. See Zimmer v. Gruntal & Co., Inc., 732 F.Supp. 1330, 1336 (W.D.Pa.1989) ("breach of fiduciary duty is tortious conduct and subject to two year statute of

limitations period, 42 Pa.C.S.A. § 5524(7)").

                              VII.
     For the foregoing reasons, we will affirm the grant of
summary judgment in favor of Janney on Count II, the federal
common law claim, and will reverse the grant of summary judgment
in favor of Janney on Count I, the ERISA claim, and on Count III,
the state law claim, and remand for further proceedings
consistent with this opinion.



GLAZIERS AND GLASS WORKERS UNION LOCAL 252,
ET AL. v. NEWBRIDGE SECURITIES, INC.,
Nos. 95-1175, 95-1215, 95-1283

STAPLETON, J., Circuit Judge, Concurring:
     I join the opinion of the court.  I write separately because
I would resolve the issue of whether ERISA preempts a state law
that would impose a fiduciary duty of disclosure on Janney under
the circumstances of this case.  The district court properly
addressed and resolved that legal issue, its resolution will not
be affected by further development of the record, and, in the
interest of conserving judicial resources, I would provide the
district court with the benefit of our view on that issue.
     Applying the principles that we reviewed in United Wire, I
would hold that if Janney is not an ERISA fiduciary under §
1002(21)(A), a state law imposing a fiduciary duty of disclosure
on it would not be preempted by ERISA.  ERISA, by spelling out
who is a fiduciary with respect to a plan and its participants,
defines the area of federal concern in which preemption is
required.  Beyond that area, I would hold that a state can
continue, by a generally applicable law, to prescribe the duties,
fiduciary or otherwise, owed to a plan by its broker, just the
way it can continue, by a generally applicable law, to prescribe
the duties owed to a plan by its accountant, its lawyer, a
corporate director of a company it owns, or its plumber.